## BROWN vs. WELSH'S EXECUTOR.

1. In the case of an adopted child, while on the one hand, so long as that relation continues, the person who stands *in loco parentis* is not entitled to pay for support, on the other hand, the person adopted can have no claim for services.

2. Where, as in this case, the money of the person taken into the family is applied, with her knowledge and consent, to her own use, after she had obtained her majority, it cannot be recovered from the person standing *in loco parentis*.

3. Settlements between a person standing *in loco parentis*, and one towards whom he occupies such relation, of the accounts of the former of expenditures made by him out of the latter's estate in his hands, made when the latter was of full age, and competent to make the settlements, can only be impeached by fraud or mistake; and to do this, the impeachment, and the ground thereof, must be set up in the bill.

On bill for an account. On final hearing on pleadings and proofs.

*Mr. S. B. Ransom,* for complainant.

*Mr. A. Mills,* for defendant.

THE CHANCELLOR.

The complainant files her bill for an account of moneys belonging to her, received by her uncle, Philip Welsh, now deceased, and interest thereon. She denies in her bill that she ever received these moneys, or any part thereof. She does not allege that Philip Welsh refused to come to an account with her, or that she ever requested him to account to her in the premises, though she states that since his death she has applied to the defendant, his executor, for an account, and that he has refused it. The moneys referred to are a legacy of $837.03, from the estate of Benjamin McCoury; another of $726, from the estate of her grandmother, Alche Williamson, and about $225, received from the estate of her mother. McCoury died in the spring of 1856. His will was proved in Morris county, in May of that year. Philip Welsh was one of the executors. The money due from her mother's estate was received by Philip Welsh, in 1854, and the legacy from her grandmother's estate was paid over by the executors in 1865. Philip Welsh's wife was the complainant's aunt. The complainant's mother died in 1833, when the complainant was but four years old. Her father died in 1852. She was taken into Philip Welsh's family when she was of but tender years, (the bill states that it was in 1835,) and continued to live there until the spring of 1874, when Philip Welsh and his wife died. When the money due from the mother's estate, (which was the first money received by him on her account,) was received by Philip Welsh, she was twenty-five years old, and she appears to have lived in his family, and to have been supported by him from the time when she was seven or eight years of age. For all that time he made no charge against her, but from July, 1854, he appears to have made charges against her for goods bought by her for her own use, and paid for by him, and cash advanced or paid to her. He charged her nothing, however, for her board. She lived in his family as a member of it. The executor answers that between the testator and the complainant, there were three statements, in which the former accounted for all the moneys received and

paid out for her by him, except $60.40, which he admitted to be due her as a balance. The bill is silent as to any accounting whatever between the complainant and Philip Welsh, in respect to these moneys. That there were such settlements of his accounts, there is no room to doubt. They are, of course, not impeached by the bill, nor is there any serious attempt to impeach them by the evidence. The complainant was, at the time of the settlement, of full age, and competent to make the settlements, and Philip Welsh is dead. They must be binding on her, unless she can impeach them by fraud or mistake, and to be permitted to do this, she should have set up the impeachment, and the ground thereof, in her bill. The evidence is, that on the 26th day of August, 1865, when she was thirty-six years old, there was a settlement between them, in which he accounted for the money received from the estate of Benjamin McCoury, and that received from her mother's estate, with interest on each. There was then found to be due to her $153.42; afterwards reduced, by a charge of $5, to $148.42. He acknowledged a balance of $150, for which he gave her his note, payable on demand, with interest. The note appears to have been paid off. Sums of money paid on account of it, to the amount of $151.92, are endorsed upon it, and the note was, at his death, in his possession, and he had written the word "paid" on its face. In his book, the same word is written across the entry stating the settlement. Again, there appears in his book a further statement of the account, in continuance, up to about July, 1869, in which the amount of the note is included as a charge against him, and credits are given to her for money received by him for her, including $26 received on account of the legacy from her grandmother, and credit is also given to her for $600 of government bonds, bought with the money received from her grandmother's estate, and interest received thereon. It shows a balance in her favor of $441.02. Again, under date of 1870, another statement appears, in which she is credited with the premium on the sale on those bonds. This statement shows a balance due her of $340.16, and finally, on the 25th of November,

1873, (he died on or about the 30th of January, 1874,) a statement of settlement was made by him, and delivered to her, by which it appeared that there was due to her from him, $60.40. It appears by the evidence, that of the money due her from her grandmother's estate, she, according to her own admission, applied to her own purposes $100, and with $600 of it bought government bonds. The evidence shows clearly that she was fully aware of the expenditures made for her by her uncle, and of the fact that he was. making them on her account, and charging them, as he had a right to do, against her money in his hands. In a letter to him, without date, but probably written in 1873, referring to a debt she had contracted in her own name, and on her own credit, with E. M. Trimmer & Co., in a running account for articles of dress, or other articles for her own use, she says : " I don't wish you to think I want you to take any of your money to pay my bills. You have the control of what little I have, and you are perfectly willing (welcome) to it all, as long as it will pay you for what you have to pay out for me." After the death of Philip Welsh, she admitted to the defendant, then acting as his executor, that she knew the state of the account, and that there was but $60.40 due to her thereon. She did not charge fraud or mistake in the account. The book was before her, and she and the executor examined it together. She in no wise impugned the correctness of the account, but her endeavor then was to obtain a compromise of a claim of $3600, which she had put in against the estate for her services in the family for six years preceding the death of the testator. The bill is not filed to obtain pay for these sums, but to recover the money received by the testator on her account. It will not be out of place to remark that the evidence does not maintain the allegation of the bill, that she was, in her childhood, adopted by Philip Welsh. He appears to have taken her into his family to bring her up, and she found a home there accordingly, until his death, at which time she was forty-four years old. Her services. were not those of a domestic. They were at most such as are usually rendered by the female members of

a family as a matter of course, and as a due contribution to the requirements of the household. In the case of an adopted child, while on the one hand, so long as that relation continues, the person who stands *in loco parentis* is not entitled to pay for support, on the other hand, the person adopted can have no claim for services. Where, as in this case, the money of the person taken into the family, is applied with her knowledge and consent, to her own use, after she had obtained her majority, it cannot, for obvious reasons, be recovered from the person standing *in loco parentis*.

The bill must be dismissed, with costs.